Good morning, your honors. May it please the court, Mr. Coughlin, this is my second trip up here, both times in the unenviable position to go first, which means you're a loser. The standpoint that this body remanded this case previously to the Commission for the purpose of in somehow remedying an inconsistent finding. And I won't dwell too much on the prior decision, but the bottom line is the arbitrator found accident, found that my client was entitled to temporary total disability benefits, that he had surgery which was not related to that medical expenses should be paid, no further TTD. We argued this before the Commission, and the Commission, in the person of Kevin Lambourne and the other two members of his panel, summarily affirmed and adopted this decision. So we came up here, you heard my argument, you sent it back and said, fix this. So it goes back to Commissioner Lambourne with two other members, not the same two who summarily affirmed it the first time. And when I read that decision, I must confess, my thought process was, he wanted to deny this guy benefits, so let's figure out a way to do it. But in culminating that opinion, he says, I still agree with the arbitrator. So we still have a mystery factor here, but maybe we can parse that out. Earlier today, you heard counsel argue about the chain of defense and whether or not causality is addressed by a physician. This guy is mucking concrete. He steps into the concrete that's just poured, has a long rod to find the mesh which then gets levitated by this pulling motion to the center of the concrete pad to make it stronger. Some guys call it rebarb wire. While he's doing that, the weld on this netting type metal structure, this rebar type material, breaks. And he falls backwards and twists. Subsequent to this event, he testifies, I get out of this mess, this fresh poured concrete, I think I'll shake it off. Guy's 60s, old hand, courtly southern gentleman. But he reports it immediately to Todd. Yet somehow, that piece of the record escapes the purview by the commission. Because they say this was an unwitnessed accident. So error number one, if you will, that struck me as somewhat disingenuous was the notion that they conclude it was an unwitnessed accident. And we've seen this many, many times. You've seen the same thing where a defense is promulgated based upon, well, nobody saw it. And usually those are the Friday afternoon injuries that don't get reported until Monday or Tuesday. This man reported it the same day. Next day – Mr. Leiske, what you're saying has some intuitive appeal because obviously not every But the causation opinion issue, or lack thereof, seems to be the order of the morning. Can we hone in on the fact that the commission and the arbitrator hung their head on Dr. Orth's opinion that the condition was not caused by a work-related injury, was at most the result of a normal degenerative process? And I'm looking, and Jimenez, who examined him and treated him, never offered a causation opinion. So how do we find that the commission erred when they accepted Orth over Jimenez? Well, the magic words that we lawyers love to see in a doctor's report, which are uniformly objected to as being created because of litigation, even though they're embodied in a treating record, is, I find within a reasonable degree of medical surgical certainty that this event as described to me by my patient could or might be causally related and the condition is causally related. What Jimenez says is, he takes a history three days after the event does a clinical examination and finds positive results to tests. Clinically, he determines the man needs an MRI. In his first chart note, the doctor recites the history and says this is a work-related injury. This is related to work. Are the magic words there? No. Is that what we're going to hope that treating doctors do? Because we know that there are the usual players here and you've seen their records and they document it as if we were deposing them or dictating to them what they should put in their chart note. But the question that's before this court is this. This man reports an event immediately. They stipulate to notice. He goes to a doctor three days later, positive clinical findings, warning, and MRI. He gets the MRI and lo and behold, there is the appearance of an acute injury. He has a torn meniscus, not a macerated meniscus, not a debilitating degeneratively caused meniscus. He has a tear in the meniscus. Much stock is put into the prior injury and the prior surgery, which Dr. Jimenez did in 1996. And yet the documentation that's offered into evidence by the respondents supports the notion that A, the meniscus that's now the subject of this claim was pristine. Those were the words the doctor used in the operative report in the previous case. So now we have a pristine cartilage that's now torn. Another question. Let's talk about Dr. Orth for a minute. I have no way of knowing what he heard. We know what he wrote. We know what he wrote. What's disingenuous about that, and again, I understand the commission has the right to make reasonable inferences, but it can't guess. It can't just speculate. Orth says all of this guy's problem are related to degenerative arthritis. And if the good doctor had had this guy take x-rays the day after the visit or, in the alternative, had evidence of prior diagnostic studies supporting his position, then certainly the commission could draw that reasonable inference, couldn't it? But the diagnostic studies that predate the exam with Dr. Orth show he had negligible arthritis in that knee. He had mild arthritic changes. Certainly no diagnostic study, MRI or x-ray, demonstrates that the guy had a condition that would develop into a degenerative macerated cartilage. On the contrary, the mechanics of the injury, as testified to by the petitioner, as reported to his boss, substantially shows that that is a connection. It's the string of consequences. And in each of Dr. Jimenez's reports, he talks about, he renews the documentation and the story about how this happened. Dr. Orth simply says, I don't understand. He didn't tell me anything that I would agree would be an accident. Now, prudence might dictate at this late stage I should have taken his deposition and quizzed him, but again, this is supposed to be simple in summary. And when I saw Dr. Orth's report and he draws a conclusion, creates a syllogism that says, I am hired by the insurance company this is the second time this guy's been scheduled for this exam. I don't have any document, I don't have any films or reports regarding x-rays or the MRI, but I do know that he had a condition some time ago, eight, nine years ago. So I conclude that this guy's problem, his need for this surgery, is not related based upon my opinion that he has significant severe degenerative arthritis. But then he goes on to say, but I don't have any films. I can't really tell you how much he's got. I really don't know. But so what? That's what I'm going to speculate. I'm going to tell my master, my employer, yeah, there's no causal connection because it's all significant degenerative arthritis. So when the case goes back on remand, one's got to wonder, how is it that the commission in its infinite wisdom was able to find by agreement that there was an accident but no causal, and then you fellas send it down and what happens? You know what? Let's see how we can screw this guy. Forgive my language. We're going to find that there was no accident. The event never happened. It was unwitnessed. The guy's a liar. That's preposterous. The string that starts on February 7th and runs through all of the visits with Dr. Jimenez, that runs through the operative report, which demonstrates the acute findings that were demonstrated on the MRI, cannot be the result of anything other than what happened on February 7th. If it was unwitnessed, where's somebody to tell us that? Where's Todd to say, oh yeah, he was working by himself. There was the guy with the big truck with the round barrel, and he was putting all the cement in there, and there was Jim Eades. Oh, but I didn't see him. Nobody saw him. And then he came to me and he was hobbling around or he wasn't hobbling around. And then he came back to work the next day and he was hobbling around or not hobbling around. Todd was never called. I understand it's my burden. I understand it's Mr. Eades' burden. But the syllogism that's created by the direct testimony of this petition that is not rebutted in any way, shape, or form on cross is that on February 7th, he was pulling this thing and it broke. He twisted his knee. He thought it would pass. He reported it immediately. He came to work the next day. He said, I can't go on. Half a day is all he could work. He goes to Jimenez, who has positive clinical findings, sends him for an MRI. The MRI discloses a tear in the meniscus, a disruption of the knee joint requiring surgery. This, to me, is one of those outcome-determined-before-review situations. I am convinced that the Commissioner determined that he was going to not allow this to be a compensable claim for whatever reason. I remained with instructions. Mr. Oleksii, tell us what you think about the Commission's finding that the concrete couldn't have hardened enough to keep his feet plowing. Well, you know, Your Honor, that was almost laughable. It was as if they assumed that this man was standing there until it started to harden and then attempted to get out. But they misread his testimony. He said, we were pouring a pad. Once the liquid wet cement is in there, it gets in there with his galoshes, as my grandmother used to call them, to pull this mesh so it would rise up to the center of the pad, the four inches of concrete. The weld broke and he twisted and fell back. Certainly it's not hardened at that point. He didn't say I was in this thing for an hour while it was setting up. He didn't say I was using a trowel while standing in here. Where that came from is, and I don't even think that's a reasonable inference, Your Honor. Thank you, Counsel. Thank you. Counsel, you may respond. May it please the Court, Mr. Oleksii, my name is Paul Coghlan. I represent Martin Samant. Just like Justice Turner, I'm kind of hoping we get back to the actual, I'm sorry, Justice Hudson. I'm hoping we get back to the actual issue here, which is causation. That was a great discussion on accident. The problem is Mr. Oleksii won on accident. The Commission never reversed on accident. They did kind of beat up the petitioner a little bit on remand and kind of say, you know, maybe we could have looked at that accident because it was pretty inconsistent there. They never reversed on accident. He wants to lead you down the garden path and have a discussion on accident because the 900-pound gorilla in the room is, why don't you put in an opinion on causation to rebut that offered by the employer. That's why you lost the case. It had nothing to do with accident. You won on accident. He won on accident. The Commission on remand did not reverse that finding. He won that issue. He won that he's got an accident. Okay. Now, did you prove a causation? The employer put in an expert from Dr. Orth. Dr. Orth testified that there was no causation between the gentleman's condition of ill-being and the accident that's now been affirmed by the Commission twice, including the fact, despite the fact that we have two new people on the panel the second time. So five different Commissioners and an arbitrator unanimously held the exact same thing all throughout this entire litigation, that there was an accident, but there was no causation. The Commission... against the claimant. He references him in his, although he's saying, okay, I agree he didn't provide a specific causation opinion as we're used to seeing, but in his report he clearly documents his history and his accident and problems that help his case. What's your response to that? My response to that is if he would have won this case, that might have supported a finding of the Commission that there was a chain of events and there was something in the medical records. The problem for the Petitioner is he lost. He lost. So even though there might have been some evidence to establish, to support a theory of causation, the Commission ruled contrary to that. So it's irrelevant. The issue is whether or not... the issue isn't whether or not there's some evidence in this record which would have supported him from there's some evidence in this record to support the Commission's determination that there was no causation. But why did the Commission say there was no causation? Because they agreed with Dr. Gordon. Because they said there was no accident. No, that's not what they said. They ruled there was an accident. There was an accident. The finding of the accident is in the original arbitrator's decision, but the arbitrator says there's a finding of accident. However, it's inconsequential to Petitioner's condition of well-being because the arbitrator then does not talk about that point. I'm looking at the decision and opinion on remand, and the Commission says after reviewing the evidentiary record they agree with the original decision that he failed to prove is causally related. The next sentence is, in arriving at this decision, the Commission takes special notice of both the history of the accident Petitioner provided at the arbitration hearing as well as the discrepancy between his testimony and histories in the medical records. Then they go ahead and recount for several paragraphs about how his story about the accident doesn't add up. Justice Stewart, they never reversed accident. Like I said, there was a discussion there where they said they basically looked at that, I agree with you, and they said, you know, he doesn't just have a problem with causation here. We have some real problems on the issue of accident. However, it was moot, just like the other issues, just like the permanency and the TTD. I challenge anybody to show me in that decision where they reversed on accident, they did not reach that issue. They didn't have to reach that issue. It didn't matter. They affirmed the arbitrator's finding that there was an accident, however, it was inconsequential. And if the Commission Well, I think it's a little less clear than what you're making it out to be here because I think when you read the decision here, the Commission's decision, the vast majority of what they write is about the accident itself. I share in Justice Stewart's concerns that they really were examining whether or not there was an accident. So, again, in terms of the decision itself, in this decision, does it indicate that they are reversing strictly on causation? It does not. And that's why, again, that would be harmless error because they already ruled there was an accident. So there is no reversal of that anywhere in this decision. I'm here saying go ahead, find the accident. I have no problem with that. That's in the record. Again, because that's an issue which has been settled and doesn't change the outcome, I don't care whether there's an accident or not. It's clear that the issue has never been reversed. The issue is causation. And if the Commission is free to choose between two competing doctors on the issue of causation, what is so wrong with them going with only one when the other side doesn't even bother to put an opinion on causation out there for them? The Commission is well, well within their authority to do that. So, again, I'm here saying go ahead, find the accident. I have no problem with that. Again, because that's an issue which has been settled and doesn't change the outcome, I'm here saying go ahead, find the accident. And if the Commission is free to choose between two competing doctors on the issue of causation, what is so wrong with them going with only one when the other side doesn't even bother to put an opinion on causation out there for them? And again, because that's an issue which has been settled and doesn't change the outcome, I'm here saying go ahead, find the accident. Again, because that's an issue which has been settled and doesn't change the outcome, I'm here saying go ahead, find the accident. Again, because that's an issue which has been settled and doesn't change the outcome, I'm here saying go ahead, find the accident. And then we have such a detailed, different history of what happened later on in records. That's what I took from that. And acknowledge they didn't need to go there. They didn't need to go into the detail they did in terms of describing the accident, the inconsistent histories, and so forth. I agree with you, Justice Hearst. I agree with you, but again, I'm back to my same point. The issue is causation. There was a competent doctor who testified to the negative. The commission adopted unanimously twice that doctor's opinion as to causation. The commission is well within their province to do that. In fact, that's their function. And it's not our job here today to reweigh the evidence. Thank you. Thank you, Counsel. Counsel, you may reply. Thank you, Your Honor. I'm struck by the notion that the scope of the assessment and review of this record by this body would be as limited as Counsel points out. What he wants you to believe is and what he suggests is and what I've heard many times over the many years is they get to pick whoever they want. And I have been before this body and posed the question, well, Mr. Alexi, your doctor says A, their doctor says B, they choose B, what do you want us to do? And at that point, I surrender. In fact, I don't think I've ever been before this body where I was fighting in the initial stage that you should ignore the opinion of their hired gun versus my hired gun. I don't have hired guns. The question is this. Did the commission reasonably review the evidence? And if they did, are they permitted to make reasonable inferences? I answer that in the affirmative. Here, however, we have a significantly flawed opinion of Dr. Orth. He says without categorization the guy's problem is not related to that event. It's related to his significant arthritis, degenerative arthritis. If he had stopped his narrative at that point, I wouldn't be here because whether I like it or not, they could choose to accept that opinion. But that's not what he said because then he goes on and he says, but I don't know how severe it is. I don't know how bad it is. I don't know whether in fact he even has it. My interjection there, he didn't say that. Because I didn't take any x-rays. I didn't review any MRIs. I didn't look at any diagnostic studies. How does the guy gain any credibility then as to his opinion when he admits he doesn't know the extent of it, but that's what he's called? Your Honors, I think this record demonstrates a total lack of involvement of the commission. I believe, and I argued this the first time I was before you, the fact that the arbitrator even mentions a prior settlement is indicia of a prejudice or a bias. I submit to you that it was a situation where the guy already got $125,000 from a 9-year-old case. That's enough. And the record demonstrates my vociferous objections to even going into that because there is no credit due. Yet we went into it. We went into it. Orff never talks about how the condition of ill-being in 1996 was simply continued to the 2000 episode when, in fact, they involved two distinct areas of the knee. Thank you. Thank you, Counsel. This matter will be taken under advisement. Written disposition shall issue.